No.: 3:18-MJ-2041

FILED
APR 11 2018
Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Michael W. Mclaughlin, your affiant, being duly sworn, state as follows:

1. I am a Special Agent (SA), with the Federal Bureau of Investigation (FBI). I have been employed with the FBI since 2015 and am presently assigned to the London Resident Agency, London, Kentucky. I am authorized and have the responsibility to investigate and arrest persons for violations of federal law, including offenses involving the unlawful distribution of controlled substances, (21 U.S.C. § 841(a)(1)), attempt and conspiracy to commit the same (21 U.S.C. § 846), money laundering offenses (18 U.S.C. § 1956 and 1957), and firearms offenses (18 U.S.C. §§ 922(g) *et seq.* and 924(c)).

2. I have received training in drug investigations, money laundering, Internet investigations, firearms offenses, and asset seizures. I have participated in multiple drug investigations, including clandestine drug laboratories, international drug smuggling operations, drug-related money laundering, and possession and distribution of marijuana, cocaine, heroin, methamphetamine, prescription pills, and other controlled substances. I have participated in the debriefing of Confidential Human Sources (CHS), as well as criminal defendants regarding the *modus operandi* of drug trafficking and money laundering. Through the course of my training and experience in past investigations, as well as my discussions with other law enforcement agents who are experienced in narcotics investigations, I have learned the ways in which drug traffickers obtain, manufacture, store, package, protect, conceal, and distribute controlled substances and their illegal proceeds. Prior to joining the FBI, I served for approximately 5

1

years at the Metropolitan Washington (Virginia) Airport Authority. During those 5 years, I gained experience in drug investigations and drug seizures.

3. Except as noted, all of the information contained in this Affidavit is either known to me personally or has been told to me by other experienced law enforcement officials.

4. As a result of my training and experience, and through consultation with other experienced investigators, I know or have reason to believe the following:

- a. That persons possess in their residences, as well as other real property and vehicles over which they have dominion and control, documents which indicate their occupancy, use, and/or ownership – such as personal mail, receipts, checkbooks, personal identification documents, notes and other correspondence, utility bills, financial documents, keys, photographs, leases, mortgage bills, vehicle registration information, ownership warranties, telephone answering machine and voice mail introductions, photographs, and undeveloped photographic film or other electronic storage devices containing photographs (when developed) of themselves occupying the property and/or vehicles;

- b. That drug traffickers often, but not always, place assets in the names of others to avoid detection and/or seizure of these assets by law enforcement, and even though these assets may be placed in the names of other persons or corporate entities, the drug traffickers actually own, use, and/or exercise dominion and control over them;

- c. That drug traffickers maintain in their residences and/or businesses, computerized (on both permanent and temporary storage media) or written books, records, receipts, notes, ledgers, airline tickets, cashier's checks, money orders, and other papers relating to the acquisition, transportation, and distribution of controlled substances;

- d. That drug traffickers routinely use cellular telephones, tablets, and other electronic devices to facilitate their drug trafficking business, including, but not limited to, the use of the text messaging feature that is available on most cellular telephones in order to contact suppliers and customers of narcotics. Moreover, these individuals often use coded language and/or text messaging in an attempt to disguise, hide, limit, and/or conceal communication regarding the illegal sale of

2

narcotics. Further, these individuals will routinely keep the actual cellular telephone device and billing and account records for their cellular telephone service in their residences;

e. That drug traffickers often "front," that is to provide on consignment sale, controlled substances to their customers, who pay for the drugs after reselling them, and that drug traffickers often maintain in their residences and/or businesses, written or computerized (on both hard drives and disks) books, records, receipts, notes, ledgers, etc., relating to the distribution of drugs, to include outstanding debts owed to them, and the collection of money from drugs that have been distributed;

f. That it is common for drug traffickers to maintain records reflecting names, nicknames, addresses, and telephone numbers (collectively referred to herein as drug ledgers) of current and/or past drug associates, co-conspirators, and/or customers, even though the drug trafficker has not dealt with a particular individual for an extended period of time;

g. That drug traffickers will accumulate and maintain substantial amounts of drug proceeds, specifically U.S. currency, and must have quick access to this currency or other liquid assets in order to maintain and finance their ongoing drug distribution activities;

h. That it is common for drug traffickers to conceal contraband, proceeds of drug transactions, and drug ledgers within their residences, businesses, vehicles, and/or within the curtilage of their residences or businesses;

i. That drug traffickers often conceal within their residences, businesses, or vehicles, and/or within the curtilage of their residences or businesses, caches of drugs, U.S. currency, financial instruments, precious metals, gems, jewelry, electronic equipment, firearms, and other items of value which may constitute the proceeds of drug transactions and/or be evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money used in, or made from, drug trafficking activities, and that courts have generally recognized that unexplained wealth is probative evidence of crimes motivated by greed - specifically, offenses related to drug trafficking;

j. That when drug traffickers amass large proceeds from the sale of drugs, they will often attempt to legitimize these profits, and in the course of so attempting, will utilize domestic banks and their attendant services including safe deposit boxes,

3

securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts;

k. That drug traffickers often take, or have others take, photographs and/or videos of themselves, their associates, and/or co-conspirators, their property, and assets purchased with drug proceeds, and normally keep these photographs and videos in their possession, in their residences place of business, and/or vehicles; and

l. That drug traffickers often acquire, maintain or utilize firearms (including handguns, rifles, shotguns, semi-automatic and/or automatic weapons) during the course of their drug trafficking activities for several purposes, including but not limited to: receipt or use of firearms as payment for drugs bought or sold; to embolden the trafficker; to protect drug stashes and the proceeds of drug trafficking; to discourage aggressive negotiation from drug customers; to intimidate drug competitors and/or potential witnesses and/or cooperators; to resist law enforcement operations; and, to generally secure the drug trafficker's property.

5. There is probable cause to believe that Frank LAKE (LAKE), aka "Boss," who is a known drug trafficker and who lives in the premises located at 169 Brantley Road, Harrogate, Tennessee 37752 (LAKE HOME), is currently using the structure located at 349 S. Marlowe Lane, Speedwell, Tennessee 37870 (TARGET STRUCTURE) to manufacture marijuana. The TARGET STRUCTURE (further identified in Attachment A) is located in the Eastern District of Tennessee and is a single-level structure with white in color siding. The TARGET STRUCTURE has a gravel driveway with a metal gate at its entrance.

6. I make this Affidavit in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to search the TARGET STRUCTURE, including vehicles and other structures on the property of the TARGET STRUCTURE used by LAKE to commit the federal offenses described above, as well as a search of LAKE's person. The items to be seized are identified in Attachment B.

4

### LAKE's Criminal History

7. LAKE is a drug trafficker who has been well-known to state and federal law enforcement. LAKE has a significant and violent criminal history. LAKE has the following Kentucky felony convictions:

- Capital Murder, Wanton Endangerment, Second Degree Assault, 1982
- Marijuana Trafficking (8oz. – 5lbs.), 1997

### LAKE's Ongoing Drug Trafficking Activities

8. From beginning on or about April 26, 2017, and continuing through present day, LAKE has used the LAKE HOME and the TARGET STRUCTURE to facilitate and promote his drug trafficking activity. Specifically, there is probable cause to believe that LAKE uses the TARGET STRUCTURE as a base for his illegal marijuana grow operation. Since January 2017, the utilities for the TARGET STRUCTURE have been in LAKE's name.

9. Additionally, as discussed further in this Affidavit, there is probable cause to believe that LAKE, as a multi-time convicted felon, illegally possesses numerous firearms within the LAKE HOME, in violation of 18 U.S.C. §§ 922(g) *et seq.* and 924(c), which helps facilitate LAKE's illegal marijuana grow operation in the TARGET STRUCTURE.

10. This investigation has utilized a known and reliable Confidential Human Source (CHS). I personally know this CHS. I am aware of this CHS' identity and I am aware of this CHS's history of assisting in drug investigations by the FBI and the Kentucky State Police (KSP). CHS has assisted law enforcement in drug trafficking investigations for approximately the last two years. CHS is familiar with controlled substances and the manner in which such items are distributed. I know CHS' information has been consistently truthful and reliable, and it has been

corroborated in several ways, including physical surveillance, controlled drug buys, and independent source information, such as public utility records. CHS has made 35 controlled drug buys from 13 different targets.

11. CHS is a close associate of LAKE's, and has been so for many years. CHS has known LAKE to be drug trafficker for approximately 20 years. CHS' primary residence is in Kentucky; however, since approximately 2017, CHS has stayed with LAKE at the LAKE HOUSE approximately 3-4 days a week. CHS has a bedroom that CHS utilizes when CHS stays at the LAKE HOUSE. CHS has been to the TARGET STRUCTURE, and has taken investigators to the TARGET STRUCTURE. CHS has seen small marijuana plants growing around the outside of the TAREGT STRUCTURE. LAKE told CHS that these marijuana plants growing outside the TARGET STRUCTURE are subsequently taken inside the TARGET STRUCTURE for further growth and maturation.

12. Since May 2017, CHS, while working with the KSP, conducted seven (7) controlled drug buys that were video and audio recorded, all of which I have reviewed. Based on my conversations with members of the KSP, these controlled drug buys would generally involve the following course of action:

- CHS calls LAKE's cell phone and/or the LAKE HOUSE's landline, which is in the name of LAKE's live-in girlfriend, Jimmie Beth Smith, and sets up the drug buy with LAKE,

- LAKE departs the TARGET RESIDENCE in either his 2014 Grey Toyota Tacoma bearing Tennessee license plate 2B3-3M6 or his 2004 Purple Pontiac GTO bearing Tennessee license plate 420-PRX, and drives to the pre-arranged location for the buy (a Wendy's restaurant located at 1275 N. 12th Street, Middlesboro, Kentucky, 40965 or Food City Parking Lot located at 102 N 12th Street, Middlesboro, Kentucky, 40965),

- CHS enters LAKE's Toyota Tacoma or Purple Pontiac and consummates the transaction with LAKE using law enforcement buy money,

6

- CHS turns drugs over to law enforcement.

In accordance with the above-described course of conduct, CHS made the following seven (7) controlled drug buys from LAKE. CHS would call LAKE on his cell phone or the LAKE HOUSE's landline and set up a meeting time and what drugs to be purchased:

- On May 11, 2017, LAKE sold CHS 45 Lorcet and 2 Buprenorphine/Naloxone tablets for $950;

- On May 25, 2017, LAKE sold CHS 32 Buprenorphine/Naloxone and 10 Xanax tablets for $700;

- On June 5, 2017, LAKE sold CHS 3 Suboxone sublingual strips for $60;

- On June 9, 2017, LAKE sold CHS 20 Lorcet and 20 Xanax tablets for $300;

- On June 15, 2017, LAKE sold CHS 20 Lorcet and 20 Xanax tablets for $300;

- On June 27, 2017, LAKE sold CHS 40 Hydrocodone, 10 Suboxone and 40 Xanax tablets for $800;

- On January 11, 2018, LAKE sold CHS 10 Oxycodone and 15 Hydrocodone tablets for $500;

13. On January 26, 2018, CHS reported that LAKE, while in the LAKE HOUSE, sold two ounces of marijuana to a female named Lou Jane LNU. CHS reported that LAKE sells marijuana every Saturday to Lou Jane LNU and has done so for years.

14. As stated above, CHS knows the location of the TARGET STRUCTURE and CHS has seen LAKE return to the LAKE HOUSE from the TARGET STRUCTURE with bags of marijuana. CHS knows that LAKE keeps plastic bags of marijuana, glass jars of marijuana, plastic bags for packaging, and scales at the LAKE HOUSE. LAKE's marijuana is primarily a product of LAKE's marijuana grow operation at the TARGET STRUCTURE. LAKE has offered CHS to sell LAKE's marijuana in the past but CHS declined.

15. In or about February 2018, while staying at the LAKE HOUSE, LAKE showed CHS a bottle of crystal methamphetamine. LAKE attempted to get CHS to use the methamphetamine but CHS declined LAKE's offer. On a prior occasion, LAKE told CHS that he (LAKE) was purchasing methamphetamine for 1,250-1,300 dollars an ounce. LAKE also told CHS that methamphetamine has destroyed LAKE's pill sales. LAKE told CHS that he (LAKE) could not give pills away because everyone wants methamphetamine.

16. CHS reported that LAKE has large amounts of unexplained cash at LAKE's disposal. LAKE purchases all of his assets with cash. CHS has seen LAKE with large sums of money to purchase vehicles, properties, and businesses. No employment records could be found for LAKE to indicate a source of income.

17. CHS reported that LAKE conceals assets at the LAKE HOUSE. For example, CHS witnessed Jimmie Beth Smith, who CHS knows to be LAKE's longtime girlfriend, ask LAKE for money. LAKE waited until dark to walk outside the LAKE HOUSE and return with a large plastic bag containing a duffle bag. CHS observed this duffle bag was full of cash and mail parcels. CHS reported that the cash smelled stale, like well water. LAKE is believed bury cash on the property of the LAKE HOUSE. CHS further reported that a large amount of cash is stashed in a hole concealed by a Kubota tractor near the LAKE HOUSE.

18. CHS has first-hand knowledge that LAKE also conceals numerous loaded firearms within the LAKE HOUSE. CHS reported that LAKE conceals a semi-automatic rifle under a tanning bed in the LAKE HOUSE. Additionally, CHS reports that LAKE maintains loaded magazines near this semi-automatic rifle. CHS reports that a closet located in a spare bedroom of the LAKE HOUSE contains multiple firearms, including handguns and long guns. As stated

8

above, LAKE is a convicted felon and cannot legally possess a firearm or ammunition. Given LAKE's possession of firearms and ammunition at the LAKE HOUSE, and based on my training and experience, I have probable cause to believe that LAKE also uses firearms to protect his marijuana grow operation at the TARGET STRUCTURE.

19. Based on this investigation, I believe that LAKE has violated, and continues to violate, federal drug trafficking laws, federal money laundering laws, and federal firearms laws. It is my further belief that evidence (as listed in Attachment B) of the above-referenced federal criminal offenses currently exists at the TARGET STRUCTURE (as identified in Attachment A).

FURTHER THIS AFFIANT SAYETH NOT.

_____
Michael W. Mclaughlin
Special Agent
Federal Bureau of Investigation

Sworn to before me this 23 day of March, 2018.

_____
H. Bruce Guyton
United States Magistrate Judge
Eastern District of Tennessee

**ATTACHMENT A**



TARGET STRUCTURE located at 349 S Marlowe Lane, Speedwell, Tennessee 37870. Metal gate and gravel driveway depicted in blue.



# ATTACHMENT B

The Court authorizes a search of the premises described on the warrant face and seizure of any of the following evidence and information. As to any premises, the authorization extends to all structures and outbuildings located at the same physical address.

1. As to the relevant period (2004-Present), books and records reflecting sales, transfer or transportation of controlled substances including but not limited to marijuana, methamphetamine, and prescription pills ,and amounts of monies owed for same.

2. As to the relevant period (2004-Present), records reflecting the names, addresses and telephone numbers of co-conspirators and telephone toll records for any residential or commercial telephone.

3. As to the relevant period (2004-Present), sales receipts and other records reflecting the expenditure, transfer, and/or transportation of monies or receipts of monies or other valuables, which are likely the proceeds from unlawful drug distribution.

4. Currency and money wrappers.

5. As to the relevant period (2004-Present), records of banking or financial transactions reasonably suspected to conceal and launder trafficking proceeds.

6. As to the relevant period (2004-Present), records of transactions to conceal valuable assets including real estate, automobiles, gold, silver, furs and precious gemstones, which there is probable cause to believe have been purchased with the proceeds of unlawful drug trafficking.

7. As to the relevant period (2004-Present), records reflecting the transportation of drugs, including airline tickets, mail receipts, private carrier receipts, credit card receipts, gasoline receipts, rented car receipts, luggage tags and other travel related records.

8. Safes or lock boxes used to conceal currency, records of illegal activity, or other contraband or fruits of crimes. [The Court permits opening of such containers regarding and as part of the execution of the warrant, to search for items enumerated in this Attachment.]

9. Firearms, to include handguns, rifles, shotguns or automatic weapons.

10. As to the relevant period (2004-Present), videotapes and photographs of drug activities and/or drug trafficking co-conspirators.

11. Controlled substances (to wit: marijuana, methamphetamine, prescription pills, and other controlled substances), as well as materials, chemicals, and equipment used for growing, cultivating, and harvesting marijuana plants.

12. Substances utilized to manufacture, weigh, package, and distribute controlled substances.

13. Controlled substance paraphernalia, such as scales, plastic baggies, rolling papers, etc.

14. Electronic devices[1] such as: telephones, cellular telephones, answering machines, recording devices, fax machines, electronic data devices and items with stored information to the extent there is a reasonable basis to believe any of same has been used to communicate regarding or transact as to unlawful drug activities. This would encompass such devices in the possession, custody, control of and/or accessible to and used by any of the persons named in the warrant affidavit.

---

[1] Responsive electronic devices may be seized temporarily, but the United States shall promptly apply to the Court for specific permission to search the content of such devices.